**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LISA SYVERTSON SHANAHAN, | Civil No. 12-2898 (NLH/KMW) |
| Plaintiff, | |
| v. | **OPINION** |
| THE DIOCESE OF CAMDEN, | |
| Defendant. | |

**APPEARANCES:**

Daniel P. Hartstein, Esquire
Liberty View
457 Haddonfield Road
Suite 310
Cherry Hill, New Jersey 08002
　　*Attorney for Plaintiff Lisa Shanahan*

William J DeSantis, Esquire
Ballard Spahr LLP
210 Lake Drive East
Suite 200
Cherry Hill, New Jersey 08002
　　*Attorney for Defendant the Diocese of Camden*

**HILLMAN, District Judge**

　　This matter comes before the Court by way of Defendant the Diocese of Camden's motion [Doc. No. 6] seeking summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the parties' submissions and decides this matter pursuant to Federal Rule of Civil Procedure 78.

　　For the reasons expressed below, Defendant's motion for summary judgment will be denied without prejudice.

**I.   JURISDICTION**

The Court exercises jurisdiction in this case pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship between the parties and an amount in controversy in excess of $75,000. Plaintiff Lisa Shanahan is a citizen of the state of North Carolina.  (Compl. [Doc. No. 1] ¶ 1.)  Defendant the Diocese of Camden ("the Diocese" or "Defendant") is a New Jersey non-profit corporation with its principal place of business in the state of New Jersey, and is therefore a citizen of New Jersey.  (Id. ¶ 2.) The amount in controversy is met because the allegations contained in Plaintiff's complaint sufficiently demonstrate that the damages sought are in excess of $75,000, exclusive of interest and costs.

**II.   BACKGROUND**

The basic facts of this case are largely undisputed and relate to Plaintiff's allegations that she was sexually abused as a child from approximately 1980-1981 by an ordained Catholic priest, Father Thomas Harkins ("Harkins").  During the time period relevant to Plaintiff's claims of sexual abuse, Harkins was employed by the Diocese and served as priest at St. Anthony of Padua Catholic Church ("St. Anthony's") in Hammonton, New

2

Jersey.[1]  (See Def.'s Rule 56.1 Statement of Material Facts [Doc. No. 6-2] (hereinafter, "Diocese's 56.1 Statement"), ¶¶ 2, 5-6; see also Pl.'s Resp. to Def.'s Rule 56.1 Statement of Material Facts [Doc. No. 9] (hereinafter, "Pl.'s 56.1 Resp.") ¶¶ 2, 5-6.)

Plaintiff was born in 1969 and shortly thereafter was baptized in the Catholic faith.  (Compl. ¶ 5; see also Diocese's 56.1 Statement ¶¶ 1-2.)  According to Plaintiff, her family was "devoutly Catholic" and "regularly attended mass and participated in the ministry" at St. Anthony's.  (Compl. ¶ 5; see also Diocese's 56.1 Statement ¶ 2.)  Plaintiff's complaint alleges that Harkins was an agent and employee of the Diocese who ministered to the congregation at St. Anthony's and provided religious instruction to both the children and adults of the congregation.  (Compl. ¶ 6; see also Diocese's 56.1 Statement ¶ 5.)  Harkins also apparently taught the children's catechism classes (also known as "CCD classes") at St. Anthony's in order to prepare the children, including Plaintiff, for "confirmation in the Catholic faith[.]"  (Compl. ¶ 7; see also Diocese's 56.1 Statement ¶ 5.)  Plaintiff was a student in Harkins' CCD class from approximately 1980-1981 while she was in the fifth grade. (Diocese's 56.1 Statement ¶¶ 4-5; Pl.'s 56.1 Resp. ¶¶ 4-5.)

---

[1] The record reflects that Harkins was defrocked as a Catholic priest in approximately 2002, and now works as a security guard at the Philadelphia International Airport.  (See Diocese's 56.1 Statement ¶ 16; Certification of Lisa Syvertson Shanahan [Doc. No. 9-1] ¶ 12.)

Plaintiff alleges that Harkins sexually abused her on approximately ten to fifteen (10-15) different occasions between 1980 and 1981 while she was a student in his CCD class and that these incidents took place in Harkins' office and in his bedroom in the church rectory. (Compl. ¶¶ 8-9; Diocese's 56.1 Statement ¶¶ 6, 14-15.) According to Plaintiff, on these ten to fifteen various occasions, "Harkins sexually abused [her] by touching her genitals over her underwear." (Compl. ¶ 9.) Plaintiff further asserts that "the final incident of sexual abuse" occurred when "Harkins brought [Plaintiff] to his bedroom in the priest's home, the rectory, pulled down [Plaintiff's] tights, and sexual abused her by putting his hands on her genitals and digitally penetrating her." (Id.) During this incident, Harkins "also tried to force [Plaintiff's] hand onto his penis." (Id.) At the conclusion of this incident, Plaintiff alleges that "Harkins told her that she was a good girl and reassured her that everything was okay with what he had done" to her.[2] (Id.)

Plaintiff represents that Harkins' sexual abuse of Plaintiff only ceased when he "was suddenly removed from the parish in approximately 1981, the summer before [Plaintiff] started sixth grade[,]" and that "[n]o explanation was given to the parishioners why Harkins had been removed or where he had been

---

[2] Plaintiff was approximately eleven years old at the time the abuse occurred. (Certification of Lisa Syvertson Shanahan [Doc. No. 9-1] ¶ 2.)

4

reassigned." (Id. ¶ 10.) Plaintiff asserts, upon information and belief, that "Harkins was removed because of an allegation made to the Diocese that he had sexually abused another young girl at St. Anthony['s] ... and was assigned outside of the Diocese[.]" (Id.)

Based on the alleged sexual abuse she suffered as a child, Plaintiff now brings claims against the Diocese for: (1) liability under New Jersey's Child Sexual Abuse Act (the "CSAA" or the "Act") in Count I; (2) negligence with respect to the Diocese's retention and supervision of Harkins in Count II; and (3) breach of fiduciary duty in Count III. Plaintiff filed her complaint in this action on May 15, 2012, and counsel for the Diocese entered an appearance on July 25, 2012. Rather than filing an answer, the Diocese responded to Plaintiff's complaint by filing the instant motion for summary judgment on September 10, 2012, prior to any discovery in this case.

### III. **DISCUSSION**

The Diocese now seeks the entry of summary judgment in its favor on all of Plaintiff's claims. Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

5

is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although

6

the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.") (citing Celotex, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. A "party opposing summary judgment may not rest upon the mere allegations or denials of the ... pleading[s.]" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (internal quotations omitted). For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322 ). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57.

## IV. ANALYSIS

With respect to Count I for liability under the CSAA, the Diocese argues that this claim should be dismissed as a matter of law because the Diocese did not stand *in loco parentis* within Plaintiff's household. (Br. of Def. The Diocese of Camden In Supp. of Mot. for Summ. J. [Doc. No. 6-1] (hereinafter, "Diocese's Br."), 4-6.)  Proceeding on the assumption that the CSAA is not applicable here, the Diocese further argues that Plaintiff's remaining common law claims for negligent retention and supervision and breach of fiduciary duty are barred by the relevant two-year statute of limitations for such claims. (Id. at 7-9.)  Plaintiff opposes the Diocese's motion contending that the Diocese has failed to meet its burden under Rule 56 and that the motion should be denied in its entirety. (Br. of Pl. Lisa Syvertson Shanahan in Opp'n to Mot. for Summ. J. [Doc. No. 9-2] (hereinafter, "Pl.'s Opp'n"), 4.)

### A. Plaintiff's Claim Under the Child Sexual Abuse Act

When it was enacted in 1992, the CSAA "established the first statutory cause of action for sexual abuse in New Jersey." Hardwicke v. American Boychoir School, 902 A.2d 900, 909 (N.J. 2006) (citing N.J. STAT. ANN. § 2A:61B-1).  The CSAA defines sexual abuse as "an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult." N.J. STAT. ANN. § 2A:61B-1(a)(1).  The Act further defines sexual abuse

8

to include circumstances where "[a] parent, resource family parent, guardian or other person standing in loco parentis within the household ... knowingly permits or acquiesces in sexual abuse by any other person[.]" Id.

As recognized by the New Jersey Supreme Court, the "CSAA thus establishes two classes of abusers: those persons who inflict the abuse (active abusers), and those persons who stand *in loco parentis* within the household who know of the abuse and who fail to protect the child (passive abusers)."[3] Hardwicke, 902 A.2d at 910. To establish liability under the CSAA against a passive abuser, the plaintiff, as a threshold matter, must demonstrate that the defendant is: "(1) a person (2) standing *in loco parentis* (3) within the household."[4] Id. at 911. The Act, however, does not define these terms. Count I of Plaintiff's complaint asserts liability on the theory that the Diocese qualifies as a passive abuser under the CSAA. Plaintiff alleges that the Diocese: (1) is a "person" as defined by the Act; (2) stood *in loco parentis* to Plaintiff; (3) was included within Plaintiff's household; and (4) knowingly permitted or acquiesced

---

[3] "The passive abuser, however, can claim an affirmative defense based on a 'reasonable fear' of the active abuser as described by the statute." Hardwicke, 902 A.2d at 910. This affirmative defense is not at issue here.

[4] Ultimately the plaintiff must also show that the passive abuser "knowingly permit[ted] or acquiesce[d] in sexual abuse by any other person." N.J. STAT. ANN. § 2A:61B-1(a)(1).

9

in Harkins' sexual abuse of Plaintiff.  (Compl. ¶¶ 39-40.)

### (1) Is the Diocese a "Person" Under the CSAA?

The New Jersey Supreme Court has previously held that the definition of "person" under the CSAA is not limited to natural persons and includes institutional or entity defendants such as schools or the Diocese.  <u>Hardwicke</u>, 902 A.2d at 911-13; <u>see also</u> <u>J.H. v. Mercer Cnty. Youth Det. Ctr.</u>, 930 A.2d 1223, 1229 (N.J. Super. Ct. App. Div. 2007) (concluding "that a county, as a municipal corporation, is a corporation included within the definition of person contained in N.J.S.A. 1:1-2 and thus constitutes a 'person' under the CSAA.").  Moreover, for purposes of this action the parties do not dispute that the Diocese is considered a "person" within the meaning of the Act.  (<u>See</u> Diocese's Br. 4-6; see also Pl.'s Opp'n 5.)

The parties disagree as to the remaining threshold issues of whether the Diocese stood *in loco parentis* to Plaintiff and whether the Diocese was included within Plaintiff's household.  A determination that the Diocese both stood *in loco parentis* to Plaintiff and was within Plaintiff's household under the CSAA is clearly material to the success of Plaintiff's claim.  If the facts demonstrate that the Diocese both stood *in loco parentis* and was within Plaintiff's household, then Plaintiff's CSAA claim is still viable.  On the other hand, if either of these conditions is not met, then Plaintiff's CSAA claim fails at the

outset.  The continuing viability of Plaintiff's CSAA claim also has significant implications relating to the statute of limitations for her common law claims.  Accordingly, the Court resolves the *in loco parentis* and household issues as preliminary matters here.

### *(2) Did the Diocese Stand In Loco Parentis?*

The phrase *in loco parentis* "literally translated means 'in the place of a parent.'"  <u>Hardwicke</u>, 902 A.2d at 913 (citing Black's Law Dictionary 803 (8th ed. 2004)).  Relying on the literal translation, the Diocese argues that Plaintiff's contact with the Diocese through St. Anthony's was limited to attendance at weekly CCD classes and mass, and that such "intermittent and superficial contact" is insufficient for the Court to conclude that the Diocese acted as Plaintiff's parents.  (Diocese's Br. 6.)

However, the New Jersey Supreme Court has provided a more expansive meaning of *in loco parentis* — one that is particularly relevant in cases brought under the CSAA.  The <u>Hardwicke</u> court described the meaning of *in loco parentis* as "'relating to, or acting as a temporary guardian or caregiver of a child, taking on all or some of the responsibilities of a parent.'"  902 A.2d at 913 (citing Black's Law Dictionary).  The *in loco parentis* relationship is usually temporary in nature and is marked by characteristics that include "the responsibility to maintain,

rear and educate the child, as well as the duties of supervision, care and rehabilitation." Id. (citations and internal quotations omitted).

Plaintiff asserts that the Diocese's characterization of its role regarding Plaintiff is "disingenuous and an unsupportable inference made improperly in the movant's favor." (Pl.'s Opp'n 6.) In support of her contention that the Diocese stood *in loco parentis* to her, Plaintiff points out that the Diocese offered the CCD classes she attended on church grounds and that Harkins exercised exclusive supervision and control over Plaintiff and the other children during that time. (Id.) In fact, Plaintiff has certified that after mass (where the children sat separately from their parents), Harkins "would lead [Plaintiff] and the other children away from [their] parents and take [the children] up to" his "private office at the Church" where Harkins conducted CCD classes "with the door closed." (See Certification of Lisa Syvertson Shanahan [Doc. No. 9-1] ¶ 5.) Plaintiff has further certified that multiple instances of her sexual abuse actually occurred in Harkins' "office during the CCD classes" in question "outside the view of the other children." (Id. ¶ 6.) Plaintiff also contends that by "enrolling their children in CCD classes, parents [at St. Anthony's] entrusted their children to" the Diocese "just as they do in the case of any public or private school." (Pl.'s Opp'n 6.)

In light of the inadequately developed record, the Court finds that the Diocese has failed to meet its summary judgment burden on the issue of whether it stood *in loco parentis* to Plaintiff. The Diocese offers virtually no facts regarding the setup and structure of the CCD classes the Diocese provided at St. Anthony's which Harkins taught. The Diocese does not even describe, let alone offer any evidence to demonstrate, what responsibilities Harkins may have over Plaintiff during these CCD classes. Rather, the Diocese makes multiple conclusory statements simply reiterating that it did not stand *in loco parentis* to Plaintiff.[5] As a result, the Court is left without sufficient information to accurately and conclusively determine whether the Diocese stood *in loco parentis* based on the nature of the Diocese's responsibilities to Plaintiff.

In contrast to the minimal evidence offered by the Diocese, Plaintiff's certification provides information that suggests the Diocese may have stood *in loco parentis* to Plaintiff. Based on this certification, it is clear that, at a minimum, Harkins had a responsibility for Plaintiff's religious education as a member of the Catholic faith as well as a responsibility to supervise and care for Plaintiff during the time the CCD classes were in

---

[5] (See Diocese's Br. 5-6) ("... there is no basis for this court to conclude that the Diocese functioned as plaintiff's parent."); ("[n]o court could conclude that, as a result of this intermittent and superficial contact, the Diocese acted as plaintiff's parents...").

session.  Moreover, it is precisely during these classes that Plaintiff alleges she was sexually abused by Harkins.  Given that Plaintiff's evidence – as the nonmoving party – is to be believed and all justifiable inferences must be drawn in her favor, Marino, 358 F.3d at 247, and in light of the lack of evidence presented by the Diocese, a finding that the Diocese did not stand *in loco parentis* to Plaintiff is premature at this time.

                         *(3) Was the Diocese Within Plaintiff's Household?*

Of the three threshold requirements under the CSAA, the parties most vigorously disagree as to whether the Diocese was within the Plaintiff's household as that phrase is construed for purposes of the CSAA.  Each side directs the Court to case law from federal or state courts in New Jersey resolving the issue in their favor.  (Compare Diocese Br. 5-6) (citing Y.G. v. Bd. of Educ. for Twp. of Teaneck, No. A-5146-09T2, 2011 WL 1466277 (N.J. Super. App. Div. Apr 19, 2011); <u>D.M. v. River Dell Regional High School</u>, 862 A.2d 1226 (N.J. Super. Ct. App. Div. 2004); Smith v. Estate of Kelly, 778 A.2d 1162 (N.J. Super. Ct. App. Div. 2001)); (with Pl.'s Opp'n 7-9) (citing Nunnery v. Salesian Missions, Inc., No. 07-2091, 2008 WL 1743436 (D.N.J. Apr. 15, 2008)).

The Diocese argues that Plaintiff's attendance at weekly CCD classes and mass are not enough to establish the Diocese as a member of Plaintiff's household.  (Diocese's Br. 6.)  Plaintiff counters that "Harkins' involvement with Plaintiff's family

14

extended directly into their 'household', as [Harkins, an agent of the Diocese,] came to Plaintiff's home in grooming her and gaining the trust of Plaintiff and her family." (Pl.'s Opp'n 9.) Plaintiff's certification describes, to some extent, the nature of the relationship which existed at that time between Harkins, Plaintiff, and her family. She certifies that "Harkins took a special interest in [her], and gave [her] honors, gifts and took [her] to outings off church grounds." (See Certification of Lisa Syvertson Shanahan [Doc. No. 9-1] ¶ 4.) One of the "special" honors Harkins bestowed upon Plaintiff, was giving her readings to perform during the weekly mass at St. Anthony's. (Id.) Plaintiff's certification makes clear that on more than one occasion, Harkins "would come to [Plaintiff's] house for [her] to practice the readings, and [to] have dinner with [Plaintiff] and [her] family." (Id.) In doing so, Plaintiff represents that Harkins "ingratiated himself to [Plaintiff] and [her] family." (Id.)

In Hardwicke, the New Jersey Supreme Court examined whether a private boarding school was considered within the plaintiff's household for purposes of a CSAA claim. 902 A.2d at 914-15. In ruling on this issue, the Hardwicke court explicitly recognized that the term "'[h]ousehold is not a word of art'" and that its meaning cannot be "'confined within certain commonly known and universally accepted limits.'" Id. at 914 (citing Mazzilli v.

Accident & Cas. Ins. Co., 170 A.2d 800, 804 (N.J. 1961)). As the Hardwicke court observed, the meaning of "household" under New Jersey law greatly "depends on the circumstances of the case and has not been restricted to persons with familial relations[,]" nor has it been limited "to include only those residing under the same roof."[6] Hardwicke, 902 A.2d at 915. Rather, "'a determination as to a party's status as a 'household member' must be based upon the qualities and characteristics of the particular relationship and not upon a mechanistic formula in a definition.'" Id. (citation omitted).

A thorough review of the cases relied upon by the parties deciding the household issue demonstrates to the Court that the determination of whether a defendant is within the plaintiff's household under the CSAA is a highly fact specific inquiry which requires examination of the "qualities and characteristics of the particular relationship" in question. In the present motion, the Diocese has failed to identify any portion of the record which establishes the qualities and characteristics specific to the relationship between Harkins and Plaintiff with respect to the issue of "within the household". Similarly to the *in loco*

---

[6] The Diocese argues that because the term household is not defined in the CSAA it should be given its plain or common meaning, which is "'a group of people who dwell under the same roof.'" (Diocese's Reply Br. 4) (citing Black's Law Dictionary 7th ed. 1999). The Hardwicke decision makes clear that this argument has no merit under New Jersey law with respect to CSAA claims. 902 A.2d at 915.

16

*parentis* issue, the Diocese's motion fails to provide sufficient pertinent information from which the Court can make a determination of whether the Diocese can be considered as within Plaintiff's household.

In contrast, even before discovery has commenced in this case, Plaintiff has presented evidence through her certification that Harkins sought her out not only in church during CCD classes, but also at her home where he came to practice readings for mass with Plaintiff and to attend dinner with Plaintiff and her family. Plaintiff's certification demonstrates that Harkins took affirmative steps to interact with Plaintiff beyond the four walls of St. Anthony's and actively sought out close personal interaction with Plaintiff and her family, in the privacy of their home. Believing Plaintiff's evidence at this early stage and drawing all justifiable inferences in her favor, see Marino, 358 F.3d at 247, Plaintiff has raised a genuine issue of material fact with respect to the issue of within the household – at least at this early stage of the litigation. Harkins' conduct in coming to Plaintiff's home to practice readings and have dinner with her family suggests more than the "intermittent and superficial contact" the Diocese contends existed here.

The Court therefore denies the motion for summary judgment as to Plaintiff's CSAA claim without prejudice to the Diocese' right to renew this motion if discovery reveals a sufficient

17

factual basis to support a renewed motion on the issues of *in loco parentis* and "within the household."  Cf. Scholar Intelligent Solutions, Inc. v. New Jersey Eye Center, P.A., No. 13-642, 2013 WL 2455959, at *2 (D.N.J. June 5, 2013) (denying defendants' motion for summary judgment as premature where it was brought "before discovery ha[d] even begun").

**B.   Statute of Limitations on Common-Law Claims**

In Hardwicke, the defendant argued that the plaintiff could not take advantage of the relaxed discovery rule provisions of the CSAA with respect to his common-law claims, including one for negligent hiring, supervision and retention.  902 A.2d at 919.  The New Jersey Supreme Court rejected this argument and found that "any common-law claims based on conduct that falls within the definition of sexual abuse ... may be brought under the liberal tolling provision associated with the two-year statute of limitations in the CSAA."  Id.  Where a valid CSAA claim is present, the Court must "look to the provisions of the CSAA in determining whether the common law causes of action alleged in the [c]omplaint" are barred by the Act's statute of limitations.[7]

---

[7] A CSAA cause of action accrues "'at the time of reasonable discovery of the injury and its causal relationship to the act of sexual abuse[.]'"  R.L. v. Voytac, 971 A.2d 1074, 1081 (N.J. 2009).  "Thus, the statute of limitations for a cause of action pursuant to the [CSAA] is two years 'after reasonable discovery.'"  Id.  "[I]n addition to a flexible statute of limitations, the Act [also] contains a broad tolling provision[.]"  Id.

18

See Nunnery v. Salesian Missions, Inc., No. 07-2091, 2008 WL 1743436, at *6 (D.N.J. Apr. 15, 2008).

To the extent the Diocese argues that Plaintiff's common law claims are barred by the two-year statute of limitations for such claims under N.J. STAT. ANN. § 2A:14-2, this argument is best addressed after a fuller development of Plaintiff's CSAA claim. As the Court has already concluded, Plaintiff's CSAA claim remains viable at this time. Therefore, the Court need not rule on the statute of limitations issue under N.J. STAT. ANN. § 2A:14-2 regarding Plaintiff's common law claims for breach of fiduciary duty and negligent supervision and retention at this time.

## V.  **CONCLUSION**

For the foregoing reasons, Defendant the Diocese of Camden's motion for summary judgment is denied without prejudice. An Order consistent with this Opinion will be entered.


Dated: June 27, 2013              s/ Noel L. Hillman
At Camden, New Jersey             NOEL L. HILLMAN, U.S.D.J.